David Stebbins (pro se Plaintiff)     123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947                        acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                            PLAINTIFF

VS.                          Case 3:22-cv-04082-AGT

JOHN DOE, d.b.a. "CMDR IMPERIALSALT" & "ZELLZANDER"        DEFENDANTS

## MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Motion for Default Judgment in the above-styled action.

## I: TABLE OF CONTENTS

| Section | Page |
|---|---|
| I.   TABLE OF CONTENTS | i |
| II.  TABLE OF AUTHORITES | iii |
| III. FACTS OF THE CASE | 1 |
| IV.  ARGUMENT | 1 |
| IV-1:   Ripeness of Motion | 1 |
| IV-2:   Propriety of Default Judgment; the Eitel Test | 1 |
| IV-2-A: Possibility of prejudice to the plaintiff | 2 |
| IV-2-B: Merits of the plaintiff's substantive claim | 2 |
| IV-2-C: Sufficiency of the complaint | 3 |
| IV-2-D: Sum of money at stake in the action | 3 |
| IV-2-E: Possibility of a dispute concerning material facts | 4 |
| IV-2-F: Whether the default was due to excusable neglect | 7 |
| IV-2-G: Public policy favoring decisions on the merits | 8 |
| IV-2-H: Eitel test in conclusion | 8 |
| IV-3:   Why this Court Should Award Maximum Statutory Damages | 8 |
| IV-3-A: The Defendant's actions were willful and malicious | 9 |

IV-3-B: Jarrod Jones is a pathological liar   9

IV-3-C: I'm especially susceptible to harm from copyright infringement,   10
much more so than most plaintiffs in copyright cases.

IV-3-D: Kiwi Farms is one of the most malicious websites on the   10
entire Internet

IV-3-E: The infringement has been circulated and spread due to Jones'   12
initial conduct.

IV-3-F: The duration of time for which the infringement has remained   13
on Kiwi Farms

IV-3-G: Jarrod Jones' massive wealth   14

IV-3-H: My lack of resources, and the fact that I don't know Jones' location,   15
means I will need a large judgment to entice collection agencies to take the
case on contingency.

V:       RELIEF REQUESTED   15

V-1:       Declaration of liability and of willful and malicious intent   16

V-2:       Statutory Damages & Costs, plus pre-judgment interest   16

V-3:       Injunctive Relief   16

V-3-A: Cease and desist distribution of the stream   16

V-3-B: Submit all his electronic devices for impounding & disposition   17

V-3-C: Ensure all third-party distributions of the stream are ceased,   17
unless they did not result from his infringement.

V-4:       Contempt of Court fines   19

V5:       Any Other Relief   21

I.       CONCLUSION   21

## II: TABLE OF AUTHORITIES

**Statutes & Rules**                                              **Page(s)**

- 11 USC § 523                                               9,16
- 17 USC § 108                                               6
- 17 USC § 410(c)                                            3
- 17 USC § 411                                               7
- 17 USC § 503                                               17
- 17 USC § 504                                               8,20
- 28 U.S.C. § 1961                                           16
- 28 USC § 1915                                              3
- Fed.R.Civ.P. 54                                            15,21
- Fed.R.Civ.P. 8                                             2


**Case Law**                                                  **Page(s)**

- Eitel v. McCool, 782 F.2d 1470 (9th Cir. 1986)             1
- Fourth Estate Public Corp v. Wall-Street.com,             6,7
  139 S. Ct. 881 (2019)
- FTC v. Affordable Media, LLC, 179 F. 3d 1228 (9th Cir. 1999)   18
- Gompers v. Bucks Stove & Range Co., 221 US 418 (1911)      20
- Greer v. Moon, 83 F. 4th 1283 (10th Cir. 2023)             9
- Hazle v. Crofoot, 727 F. 3d 983 (9th Cir. 2013)            13
- Hustler Magazine v. Moral Majority,                        2
  796 F. 2d 1148 (9th Cir. 1986)
- Los Angeles News Serv. v. Reuters TV Intern.,             8,14
  149 F. 3d 987 (9th Cir. 1998)
- Trobaugh v. Hall, 176 F. 3d 1087 (8th Cir. 1999)          passim
- White v. McKinley, 605 F. 3d 525 (8th Cir. 2010)          20

### III: FACTS OF THE CASE

1.       On June 25, 2022, I did a livestream debate on my Twitch channel called "Elden Ring Sucks: The Livestream Debate." When the stream concluded, I moved it to my YouTube channel and made it viewable only to those who paid my channel $1 per month.

2.       On June 28, 2022, Jarrod Jones paid the $1 fee to access the stream, but instead of watching it for his own entertainment, he downloaded the stream illegally and reposted it, verbatim and wholesale, onto another website called kiwifarms.net, thereby removing the paywall for everyone else. I quickly applied for copyright registration and filed this lawsuit.

3.       Since the filing of this motion, the Defendant has moved to California (although his exact location is unknown), and he still has not taken down the infringing article.

4.       Service of process was finally executed on March 1, 2024. The Defendant was entered into default for failing to appear on March 26, 2024.

### IV: ARGUMENT

5.       For the following reasons, the Court should grant this Motion for Default Judgment.

#### IV-1: Ripeness of Motion

6.       Service was executed on the Defendant on March 1, 2024. See Dkt. 35.

7.       The deadline for the Defendant to appear in the case was March 25, 2024.

8.       That date came and went without an appearance from the Defendant. So on March 26, 2024, I moved for entry of default, which the Clerk timely entered. See Dkt. 36 & 37.

9.       Therefore, this Motion is now properly before the Court.

#### IV-2: Propriety of Default Judgment; the Eitel Test

10.      The binding precedent of Eitel v. McCool, 782 F.2d 1470 (9th Cir. 1986) sets forth seven factors the Court should consider when deciding whether to enter a default judgment. Those seven factors are (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. See id at 1471-72.

11.     I will address each of these factors in turn. While I address each factor, please keep in mind that all material facts are considered admitted to, except the extent of damages. See Fed.R.Civ.P. 8(b)(6).

IV-2-A: Possibility of prejudice to the plaintiff

12.     If I do not get a default judgment in this case, the circulation of my copyrighted work will almost certainly continue. Not only that, but it would embolden other people to pay the fees to access my paywalled videos and repost them for free, since they would now have precedent that they will not be held liable as long as they just ignore the lawsuits filed against them.

13.     Therefore, I do indeed stand to be heavily prejudiced if judgment is not entered in my favor.

IV-2-B: Merits of the plaintiff's substantive claim

14.     "There are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

15.     The infringement is blatant and publicly visible. Even to this day, the Court can still see with its own two eyes the publicly-visible post where the infringement happened.

16.     Since the Complaint was filed, Kiwi Farms' server host – Cloudfare – has ceased business with them. See https://www.washingtonpost.com/technology/2022/09/03/cloudflare-drops-kiwifarms/. Since then, Kiwi Farms has had to hop from host to host, and thus does not have a stable and reliable presence on the Clearnet. However, they are still visible on the dark web.

17.     If you have a Tor browser (or any other browser capable of accessing the dark web, such as Brave), then you can still see the infringement at the following URL:

https://kiwifarmsaaf4t2h7gc3dfc5ojhmqruw2nit3uejrpiagrxeuxiyxcyd.onion/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-45#post-12293426

18.     As the Court can clearly see, this infringement is blatant.

19.     The Court can see, just from watching this 4-part infringement, that the debate stream has minimal creativity (my debate partner and myself are exchanging opinions with each other, which qualifies as minimal creativity). The stream is obviously fixed into a tangible medium of

expression, and it is clearly a work of human authorship. Therefore, I have a valid and enforceable copyright.

20.     I have registered the copyright with the US Copyright Office. The registration number is PA0002364261. This entitles me to a statutory presumption that I own the copyright and that it is valid. See 17 USC § 410(c).

21.     Therefore, the first essential element for copyright infringement – ownership of the copyright by the Plaintiff – is almost certainly proven in my favor.

22.     Meanwhile, the second element – copying by the Defendant – is also almost certainly proven in my favor. As the Court can clearly see form the above dark web link, his reposting of the stream was flagrant.

23.     In fact, even the Defendant himself admitted in a Kiwi Farms post that this was a strong case for infringement. See **Exhibit A**[1].

24.     Therefore, this factor undoubtedly weighs in favor of granting default judgment.

<u>IV-2-C: Sufficiency of the complaint</u>

25.     This factor appears to be redundant of the § 1915 review that the Court is already supposed to conduct in this case because I am proceeding in forma pauperis. This factor might be more relevant in a case where the Plaintiff has paid the filing fee, thus bypassing that initial review. But in this case, I will assume that the Court has already screened the complaint for sufficiency, pursuant to 28 USC § 1915(e) and determined that I have sufficiently stated a claim upon which relief can be granted.

<u>IV-2-D: Sum of money at stake in the action</u>

26.     I am asking for statutory damages of $150,000. That is certainly a sizeable amount, but it is not astronomically large. This is not the sort of lawsuit between two multinational corporations where the damages can easily enter seven, eight, or even nine digits.

27.     Moreover, I only requested statutory damages of $150,000 because *the statute* plainly allows me to request that much. That's why it's called *stautory* damages. My damages request

---

1     which the Court can view by going to the url of
      https://kiwifarmsaaf4t2h7gc3dfc5ojhmqruw2nit3uejrpiagrxeuxiyxcyd.onion/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-53#post-12421904

cannot possibly be excessive when the law plainly gives me permission to ask for that.

28.    However, while it is not the kind of astronomical damages typically litigated over in multinational corporation lawsuits, it is still a sizeable amount of money, so I suppose we can go ahead and say that this factor is neutral, or perhaps a "borderline" factor.

<u>IV-2-E: Possibility of a dispute concerning material facts</u>

29.    First, as I demonstrate in Section IV-2-B of this Memorandum, the two essential elements of copyright infringement are handily met in this case.

30.    Also, for reasons I demonstrate in Dkt. 23, the odds that I've "got the wrong man" are astronomical, since he was traced through the credit card used to access the video, and he even contacted me over email using an alias (Mikeal Hawkins) that was later confirmed by Been Verified to be associated with Jarrod Jones. If that email address was trying to impersonate Jarrod Jones in order to frame him, that framer would have to have known, in advance, that ...

(a)    Google would implicate Jarrod Jones in response to the subpoena,

(b)    that Jarrod Jones uses the alias Mikeal Hawkins from time to time,

(c)    that Been Verified would record the use of that alias in its report about him,

(d)    that I (David Stebbins in particular) would actually pay for a Been Verified report in order to corroborate Google's subpoena response, and

(e)    that I (David Stebbins in particular) would personally *notice* that Mikeal Hawkins was listed as one of Jones' aliases when reviewing that report, and connect the dots between that Been Verified report and the email I had received months and months prior.

31.    The odds of all of that being true are one in a million, and even if by some miracle the framer knew about factors (a), (b), and (c) (which is already astronomical), he had absolutely no way at all of knowing about (d) and (e), both of which were indispensable to pulling off this frame job successfully. It is by far more likely that there was no frame job, and that Jarrod Jones really is the guilty party.

32.    Then there is the possible issue of personal jurisdiction. However, in addition to the grounds for jurisdiction I already listed in the Complaint, we must remember that Jarrod Jones has since moved to California. See Dkt. 31. See also Dkt. 34, p. 2 ("they told the U.S. Marshal

that Jones had moved to California"), and as I already showed, the infringing article is still pub-licly visible. Therefore, even if the initial posting of the infringing article was not subject to California jurisdiction, he is still *maintaining* the infringement from his new California home. His refusal to take the infringing article down is itself just as much of an infringement of my copyright as the initial posting was. See https://blogs.gonzaga.edu/gulawreview/files/2011/02/Graham.pdf. Therefore, at least that much activity is subject to the jurisdiction of the State of California, which means the entire rest of the case is likewise subject to jurisdiction in California, even if (by some miracle) it wasn't already subject to California jurisdiction when I first filed this suit.

33.     At this point, the best the defendant can possibly hope for regarding a dispute of material fact is some kind of affirmative defense. However, seeing as the copyright infringement in this case was flagrant, there are not many defenses or exceptions to copyright infringement that the Defendant could possibly raise.

34.     He has no case at all for fair use. In his infringing post, he provided a grand total of ***three whole sentences*** of original content ...

> "Here is the video of the Elden Ring 'debate' split into parts. I like how 8 minutes into it starts to devolve. The sores on his face is apparently he 'cut himself while shaving.'"

35.     ... before proceeding to post *the entire stream*, broken up into four parts! Of those three sentences, only two of them (the second and third sentences) could even nominally be considered criticism or commentary. The first sentence is just him announcing what he's doing, which has no transformative value. The other two sentences could charitably be considered "nominally transformative," but that still isn't enough to be allowed to post *the entire stream*! If he had only posted a 10-15 second clip of around the 8 minute mark, he would have had a much stronger case.

36.     Nor is there any reasonable likelihood that he would be eligible for the archival defense.[2] There are multiple reasons why the archival defense in inapplicable here. First, in order to even be eligible to bring the archival defense in the first instance, you have to actually be either a

---

2   One of the Defendant's advocates – a YouTuber by the name of Enclave Emily – advocated that this reposting should be eligible for the archival defense, and that this behavior should be seen as "perfectly <expletive> normal." See https://youtube.com/clip/UgkxsdcOnthDXt0Hfsdx5Q_feWehWXlwkV6C. So this is at least worth nominally addressing, especially so that everyone following this case can know not to try and raise this defense in the future.

library or an archive, or an employee of same. That's it. Just those two entities, and absolutely no one else, are even eligible in the first instance to even so much as raise an archival defense. See 17 USC § 108(a). Even entities that normally perform archival-like functions (such as museums) are not eligible for this defense. The plain text of § 108(a) does not say "an entity such as a library or archives'" it just says "a library or archives," which provides no avenue for judicial expansion of the coverage. Even if we assume that the list of eligible entities could be expanded to some degree, it would be preposterous to assume that any random person on the Internet is legally empowered to repost whatever copyrighted content he wants on whatever website he wants, simply call out the word "Archive!" like how one calls out the word "Safe!" in a game of tag, and expect that to be legally valid. Such a prospect is ludicrous on its face.

37.     But even barring that, there is another barrier to receiving this defense that Jarrod Jones has utterly failed to meet: Whenever the archive is kept in a digital format (as is the case here), it is not allowed to be distributed outside the premises of the library/archive in which it is kept. See § 108(b)(2) and § 108(c)(2). This means that any time a copyrighted work is posted to a publicly-visible webpage, as is the case here, that is an automatic bar to any archival defense, assuming one was ever allowed in the first place.

38.     The only other defense that Jones could even nominally raise is that the registration of the copyright was not finalized at the time the lawsuit was filed, and so the case is subject to dismissal under Fourth Estate Public Corp v. Wall-Street. com, LLC, 139 S. Ct. 881 (2019). Of course, even if that defense were to hold up (more on that momentarily), then, if that's the only thing he can raise in his defense, then the worst that could possibly happen in such a case is that the case would be dismissed *without prejudice*. If it came to that, I could re-file the case today, and it would immediately be back on track.

39.     But even barring that, there is a clear statutory exception to that case law that is plainly applicable here. The statute of 17 USC § 411(c) provides this exception. When the copyrighted work in question was originally broadcast live (as is the case here), then I am exempt from the Fourth Estate precedent as long as I notify my audience that I intend to seek registration, and then promptly do so no more than three months after the initial broadcast. I have handily met the

criteria for this exception; see Dkt. 1, Complaint, ¶¶ 8-9. Therefore, the case is not subject to dismissal – not even without prejudice – under this defense.

40.     No other defenses are even nominally worth discussing. The stream is not public domain, he never got a license from me, and due to the complete lack of any defense, Jones cannot claim innocent infringement.

41.     So all in all, the odds that there might be a dispute of material fact are one in a million. This factor definitively weighs in favor of default judgment.

### IV-2-F: Whether the default was due to excusable neglect

42.     The odds that Jones' default was due to excusable neglect are highly slim. As I pointed out in Dkt. 30, ¶¶ 7-9, the Defendant knew about this lawsuit since the beginning. Even the Court acknowledges that the defendant has publicly admitted in a Kiwi Farms post to being aware of the action. See Dkt. 34, p. 3 ("A person using the username ZellZander also posted a screenshot of Stebbins's complaint on kiwifarms.net and commented, 'I guess it's now my turn to be sued'").

43.     As I pointed out in Sections IV-2-B and IV-2-E of this motion, there is honestly no defense that Jones could possibly put up. If he were to appear, the best he could possibly hope for is to nego-tiate favorable settlement terms, but as this Court has already noticed, Jones seems utterly unin-terested in that. See Dkt. 34, p. 3 ("email thread in which Stebbins proposed, and Hawkins rejected, alternative dispute resolution"). See also Dkt. 30-1 ("I want trial by combat... Trial by combat only").

44.      Therefore, by far the most likely reason why he chose to default is because he knew there was no defense he could possibly make, so the best he could possibly hope for was to wait for a default judgment and just hope that it would be the best he could hope for.

45.     Therefore, this factor weighs in favor of default judgment.

### IV-2-G: Public policy favoring decisions on the merits

46.     This is the one Eitel factor that weighs in the Defendant's favor, but that's only because it *always* weighs in the Defendant's favor. If this factor, alone, were enough to overcome my entitlement to default judgment, then it would be impossible for anyone, anywhere, to ever get a default judgment. This would set a dangerous precedent that anyone can avoid liability through the simple expedient of ignoring the lawsuit, no matter how flagrant their tortuous conduct was.

47.     This factor should be to default judgment what the second factor is to fair use: Of

nominal importance. Otherwise, it would be unfair to plaintiffs all over the country.

<u>IV-2-H: Eitel test in conclusion</u>

48.     In conclusion, five of the seven Eitel factors weigh definitively in favor of granting me default judgment, one of them is very heavily bordering the line and therefore neutral (which only means it does nothing to overcome the multitude of other factors that weigh in my favor), and only one factor weighs in the Defendant's favor, the one factor that always weighs in the defendant's favor no matter what.

49.     If we set aside the neutral factor due to it not affecting the balancing of factors one way or the other, we are left with a 5-1 split, with the balance tipping very heavily in my favor. Therefore, the Eitel test has been handily satisfied, and default judgment should be entered in this case.

**IV-3: Why this Court Should Award Maximum Statutory Damages**

50.     The Court must award at least $750 in statutory damages in this case. See 17 USC § 504(c)(1). But it has discretion to award up to $150,000 in statutory damages.

51.     The Court may award damages in excess of $30,000 if I prove that the Defendant acted with knowledge that his actions were in violation of copyright law. See § 504(c)(2).

52.     While reviewing these factors, please remember that "awards of statutory damages serve both compensatory and punitive purposes ... in order to sanction and vindicate the statutory policy of discouraging infringement." See Los Angeles News Serv. v. Reuters Television Intern., 149 F. 3d 987, 996 (9th Cir. 1998) (citations and quotations omitted). Increasing statutory damages is appropriate for exceptionally egregious behavior.

53.     For the reasons set forth below, the Court not only has discretion to award statutory damages up to $150,000, but it *should* award the maximum possible statutory damages award, or at the very least, statutory damages in six figures.

<u>IV-3-A: The Defendant's actions were willful and malicious</u>

54.     First, the Defendant's actions were undeniably willful and malicious, thereby increasing the maximum statutory damages award to $150,000. This is evidenced by the fact that, immediately after making the infringing post, he made another post where he plainly admitted to

paying me the fee "just to snag" the stream so he could repost it on Kiwi Farms. See **Exhibit B**[3].

55.     This post is a confession, not just that he knew that his actions were likely in violation of copyright law, but also that he did them for the sole purpose of removing the paywall for everyone else, enabling others to see the stream without having to pay me one thin dime for it. In other words, by his own admission, his actions were designed to inflict commercial harm onto me.

56.     Indeed, for users of Kiwi Farms, that is the *default* objective when they post copyrighted material. See Greer v. Moon, 83 F. 4th 1283, 1295 (10th Cir. 2023) ("Indeed, Kiwi Farms users had been uploading Mr. Greer's copyrighted materials with the explicit goal of avoiding anyone 'accidentally giv[ing] [Mr. Greer] money'").

57.     Not only does this authorize the Court to award statutory damages of up to $150,000 (not just $30,000), but it also should be sufficient to ensure that the judgment cannot be discharged in bankruptcy, pursuant to 11 USC § 523(a)(6).

IV-3-B: Jarrod Jones is a pathological liar

58.     Adding to Jarrod's maliciousness is the fact that he seems incapable of telling the truth, even on matters of no consequence. In fact, he will literally say two incompatible things back to back, simply because that's what he does.

59.     For example, after posting the infringing video, Jones responded to the prospect of being sued by saying "I am not worried. I got a lawyer handy." See **Exhibit C**[4]. But then he says, just a few weeks later, that "I have no source of income at the moment and can't afford an attorney." See **Exhibit D**[5]. Those two statements cannot both be true. One of them has to be a lie. Of course, there's no reason for him to lie, other than the fact that he's just a pathological liar. But that only means he deserves heightened statutory damages in order to teach him a lesson.

---

3   which the Court can view by going to the url of
    https://kiwifarmsaaf4t2h7gc3dfc5ojhmqruw2nit3uejrpiagrxeuxiyxcyd.onion/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-45#post-12294242
4   which the Court can view by going to the url of
    https://kiwifarmsaaf4t2h7gc3dfc5ojhmqruw2nit3uejrpiagrxeuxiyxcyd.onion/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-46#post-12302452
5   which the Court can view by going to the url of
    https://kiwifarmsaaf4t2h7gc3dfc5ojhmqruw2nit3uejrpiagrxeuxiyxcyd.onion/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-55#post-12427974

<u>IV-3-C: I am especially susceptible to harm from copyright infringement, much more so than</u>
<u>most plaintiffs in copyright cases.</u>

60.    Copyright law is often scoffed at by the younger generation. See In re Aimster copyright litigation, 334 F. 3d 643, 645 (7th Cir. 2003) ("The swappers, who are ... disdainful of copyright and in any event discount the likelihood of being sued or prosecuted for copyright infringe-ment"). However, a major reason for why that is is because the most common plaintiffs in copy-right infringement cases are millionaire artists – possibly even multi-billion-dollar multinational corporations – who have already made millions and millions of dollars off of their respective intellectual property, and who are simply hoarding the IP just out of pure greed. Below are just a few examples of the way most people perceive millionaire artists vigorously enforcing copyright:

- https://www.youtube.com/clip/Ugkx0cQM7Yy0ln7n4hREr65nKNtENWkITIyA

- https://www.youtube.com/clip/UgkxPfxYAm4OFSmm2XXaMc88SPGpZKZeOvZa

61.    However, I am light years away from that stereotype. As this Court has already acknowledged, I am very poor. See Dkt. 34, p. 1 ("Stebbins's financial resources are limited; he is proceeding in forma pauperis"). For me, every sale is precious, and copyright infringement in my case really does represent the difference between poverty and financial security, not merely wealth vs super duper wealth.

62.    For this reason, the Court should treat this act of infringement as more serious, and award more statutory damages, than the same infringement under otherwise identical circumstances inflicted on a multi-millionaire musiciann or a AAA Hollywood studio.

IV-3-D: Kiwi Farms is one of the most malicious websites on the entire Internet

63.    Imagine if some online post was not only tortuous (not just copyright infringement, but also potentially defamation or perhaps harassment), but it was also posted for a group that was especially dedicated to illegal activity, such as the KKK or even ISIS. Would that justify an increase in punitive damages, compared to whether the content was posted on some more neutral website, such as Twitter or Facebook? If so, then this section is pertinent.

64.    Kiwi Farms isn't just "a" message board forum. It is one of the most vile and toxic communities on the entire Internet. The entire website is dedicated almost exclusively to

harassing, doxxing, and cyberstalking their victims; Barnes & Noble sells books, Playboy produces pornography, WWE produces professional wrestling events, and Kiwi Farms harasses, doxxes, and cyberstalks people for its users' demented amusement. It's literally what they do. It's literally their entire business model.

65.    See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ...

> "Kiwi Farms is a forum similar in design to 4chan or 8chan, where anonymous posters gather. But instead of just spreading noxious discourse, Kiwi Farms users turn to the site to plan and coordinate. They work to make the lives of their targets a living hell. Their tactics include doxxing, SWATing, defaming, encouraging self-harm, and stalking, online and sometimes off.
>
> Kiwi Farms harvests anguish. It thrives on pain and revels in death. Users of the innocuously named forum prey on the vulnerable and marginalized—people who are transgender, neurodivergent, disabled, financially struggling—with persistent and twisted harassment campaigns... reporters are wary of becoming targets themselves. The users call their victims "lolcows" because their pain can be milked for laughs. The group made its purpose clear on its Twitter page before it was taken down: 'Gossip and exploitation of mentally handicapped for amusement purposes.'
>
> Kiwi Farms users deploy slightly different tactics for various victims, but the rough beats are the same. First, the group assembles extensive dossiers. Then they use the information (some true, some contorted, some fabricated) to torment their targets."

66.    In fact, do you remember earlier, when I said that the clearnet links no longer work because their server host Cloudfare had terminated its service for Kiwi Farms? Well, the *reason* they did that is because the harassment, doxxing, and cyberstalking had gotten so bad that it literally presented an imminent threat to people's lives! See

https://www.washingtonpost.com/technology/2022/09/03/cloudflare-drops-kiwifarms/

> "'As Kiwi Farms has felt more threatened, they have reacted by being more threatening,' Prince said. 'We think there is an imminent danger, and the pace at which law enforcement is able to respond to those threats we don't think is fast enough to keep up.'
> Prince said contributors to the forum were posting home addresses of those seen as enemies and calling for them to be shot."

67.    Of course, this alleged "threat to life" has been going on for quite some time now. In fact, the website has been known to harass at least three different people to the point where those people kill themselves![6] In fact, that website is so gleefully dedicated to driving their victims to harassment that they *literally have a counter* on their website (known as the "Kiwi Kill Count") dedicated to keeping track of how many people they've managed to make kill themselves![7]

68.    The statement I made earlier – that Kiwi Farms was "one of the most vile and toxic communities on the entire Internet" – is a bold claim, but as you can clear see, it isn't an unfounded one. For this reason, because Jarrod Jones chose this site to post his infringement on, as opposed to any other site, the statutory damages should be increased.

IV-3-E: The infringement has been circulated and spread due to Jones' initial conduct.

69.    Naturally, once people had access to a free version of this stream, they wasted no time downloading and sharing it amongst themselves. Others have even reposted the stream on other websites, such as YouTube. One such example happened on December 11, 2022, when a YouTuber by the alias "Acerthorn the True Acerthorn" posted the stream to his own channel, in its entirety, with no alterations or edits whatsoever. I created a burner account to ask him how he got the stream without paying for it, and he admitted that he got it from ZellZander on Kiwi Farms. See **Exhibit E**. That video was quickly removed after I issued a DMCA Takedown Notice against it, but the fact that it happened in the first place is proof that Jones' actions are having a ripple effect that may take a literal lifetime to undo.

70.    Therefore, Jarrod Jones' infringement is the butt-for cause for other people having access to this stream without paying for it. His infringement has literally caused even more infringement to occur.

---

6   See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ("Its victims reportedly include Julie Terryberry, who in 2016 took her life after being targeted by users of the site. Two years later, after years of harassment from Kiwi Farms trolls, Chloe Sagal lit herself on fire in a public park. In June 2021, an American video game developer based in Japan, named David Ginder, took their life amid a campaign of Kiwi Farms abuse").

7   See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ("Most websites aren't known for having a 'kill count.' Kiwi Farms is... Users gleefully imagined Ginder's death: 'Here's hoping for a +1 to the kiwi kill count' ... Everyone will get a point on their counter if he does it, and I only need two more to get free a milkshake").

71.     By this point, it is a foregone conclusion that other people will continue to have the stream saved to their computers, ready to repost it. Jones conduct has made it virtually impossible for me to profit off of this stream the way it was intended.

72.     Therefore, he deserves to have his statutory damages increased in order to compensate for the additional infringement that his actions have enabled.

IV-3-F: The duration of time for which the infringement has remained on Kiwi Farms

73.     More than any other factor being discussed in Section IV-3 of this motion, this has the potential to justify the maximum $150,000 in statutory damages all on its own.

74.     Federal appellate courts have held that, when the injury inflicted is tangible, and is ongoing over the course of multiple days, but where an exact market value of that injury is very difficult to calculate exactly, that a ballpark estimate of $100 per day is a fair amount of compensatory damages. See Hazle v. Crofoot, 727 F. 3d 983, 993 (9th Cir. 2013), citing the 8th Circuit case of Trobaugh v. Hall, 176 F. 3d 1087 (8th Cir. 1999), which overturned the District Court's award of $1 in nominal damages. See id at 1089. Since Trobaugh v. Hall is the case law which established these types of damages, I will refer to them as "Trobaugh damages."

75.     Trobaugh v. Hall was first published in May of 1999. During that time, $100 had the same buying power as $185.57 in the month of January 2024 (the most recent month for which statistics are available). See **Exhibit F**[8].

76.     However, even that isn't enough. The Trobaugh court didn't simply order damages of $100 per day, but also punitive damages on top of that! See id at 1089 ("Further, we ask the District Court to reconsider awarding punitive damages against Hall"). The $100 per day in Trobaugh damages was actually a stand-in for *compensatory*, not punitive damages. Remember that, in a copyright infringement case, statutory damages are meant to serve both functions. See LA News, supra.

77.     When you take into account both inflation and the need to consider punitive damages, Trobaugh damages of $250 per day appears quite reasonable. In fact, even if we just add punitive damages and don't consider inflation, Trobaugh damages of $250 per day is reasonable, since that would be less than treble damages, and treble damages are almost always upheld as

---

8     The Court can run these calculations for itself by going to the url of www.bls.gov/data/inflation_calculator.htm.

reasonable and not excessive.

78.     So if we apply $250 in Trobaugh damages per day, that means we reach the maximum $150,000 in statutory damages after 600 days of continuous infringement.

79.     The infringing article was originally posted on June 28, 2022. This motion is being filed on March 26, 2024, and as of the time of this filing, the infringing article is still publicly viewable on Kiwi Farms. This means that, as of the time of this motion's filing, the infringing article will have been publicly visible for ***six hundred and thirty-seven continuous days***! This is well over the 600 day cut-off point mentioned earlier.

80.     This means that Jones has accrued the maximum $150,000 in statutory damages, just on Trobaugh damages alone.

81.     Even if the Court insists on only giving Trobaugh damages of $100 per day, without punitive damages and without adjusting for inflation since 1999, that still leaves us with Trobaugh damages of $63,700, and that's only if Jarrod finally deletes the post today, which he in all likelihood is not going to do. By the time this Court gets around to ruling on this motion, there is a very good chance that the infringing article will have been publicly visible for over two whole years (or 731 days, considering there was a Feb. 29 during that time). From there, the numerous other aggravating factors mentioned in Section IV-3 of this Motion should easily be enough to justify the other half of the $150,000 statutory damages cap.

### IV-3-G: Jarrod Jones' massive wealth

82.     Wealthy people need to have much larger fines & punitive damages levied against them in order to teach them a lesson, since damages that would severely deter a working class or poor person such as myself would barely be a blip on the radar for a rich person. For example, in his civil case for real estate fraud, Donald Trump was ordered to pay a fine of $10,000 per day for contempt of course. See www.cnn.com/2022/04/26/politics/trump-contempt-fine/index.html. The fines needed to be so massive because Trump would not have felt anything less than that.

83.     In the instant case, Jarrod Jones is not "Donald Trump" rich, but he is financially well off enough that an increase in statutory damages is presumed to be needed in order to properly teach him a lesson. To show this, please see **Exhibit G**, a Been Verified report that I had acquired at

the same time I filed Dkt. 23, but that I didn't file with the Court because, at the time, there was no need to. Notice how, at the bottom of Page 9 of that exhibit, it says that "Jarrod has an estimated income of $150k - $175k." Also, on Page 10, Been Verified was unable to find any significant work history about Jarrod, but at the top of Page 10, it does say that Jarrod "has investments." This means that the interest from his investments is likely serving as the primary source of that $150-175k income, all without him even needing to hold a day job.

84.     Therefore, just like Donald Trump before him, Jarrod Jones deserves to have the statutory damages levied against him amplified, so that he will actually feel their sting.

<u>IV-3-H: My lack of resources, and the fact that I don't know Jones' location, means I will need a large judgment to entice collection agencies to take the case on contingency.</u>

85.     As the Court has noted, I have very limited resources and do not currently know the Defendant's exact location. This will make collecting on the judgment very difficult, and it would certainly be in my best interests to hire a trained professional to track him down. Judgment collection agencies have specialists who can track down defaulting debtors. However, since I obviously cannot afford to retain such a professional for a flat rate, I must instead agree to let them keep a portion of the damages they manage to collect.

86.     But in order to do that, I will need a massive boost to the judgment, so that I will still be left with fair compensation for my injuries (which, again, are to the tune of $63,000-$75,000 just on Trobaugh damages alone) even after the debt collectors take a contingency fee.

87.     For all of these reasons and more, the Court would absolutely be reasonable in awarding me statutory damages of $150,000. At this point, awarding me anything *less* than that should require justification on the record.

## V: RELIEF REQUESTED

88.     In light of the totality of the circumstances, I hereby request the following relief from the Court in the form of a default judgment. Please remember that, in my Complaint, I requested "whatever other relief the Court believes is necessary to make me whole in this case." See Dkt. 1, ¶ 27. This exempts me from the limitations normally set forth by Fed.R.Civ.P. 54(c), and authorizes the Court to award whatever relief it deems appropriate, even if I didn't ask for that

exact relief in the Complaint.

### V-1: Declaration of liability and of willful and malicious intent

89.     First, I request a declaration from this Court that ...

(a)     the defendant infringed my copyright,

(b)     that he did so willfully and maliciously,

(c)     with the intent of depriving me (the Plaintiff) of my ability to profit from the

copyrighted work.

90.     Not only will this declaration enable the Court to award statutory damages of up to

$150,000, but it will also prevent the Defendant from being able to discharge this debt in

bankruptcy, pursuant to 11 USC § 523(a)(6).

### V-2: Statutory Damages & Costs, plus pre-judgment interest

91.     Next, I ask the Court to award me statutory damages of $150,000. As I established

throughout Section IV-3 of this Motion, such an award is not only fair, but anything less than that

should itself require justification at this point.

92.     In addition, I also ask that my costs be reimbursed to the tune of $125. The breakdown of

costs are as follows:

(a)     $65 filing fee to register the copyright with the US Copyright Office;

(b)     $10 postage to mail the Complaint to the Courthouse via USPS Priority Flat-Rate

Mail, since I could not get ECF access until the case already had a case number;

(c)     $30 for a one-month subscription to Been Verified[9] in order to corroborate Google's

subpoena response; and

(d)     $20 for a one-month subscription to Spokeo[10] to further corroborate the Google

subpoena response and Been Verified's report of same.

### V-3: Injunctive Relief

93.     I request the following three injunctions:

#### V-3-A: Cease and desist distribution of the stream

94.     First, pursuant to my request in Dkt. 1, ¶ 24, I ask that the Defendant be ordered to cease

---

9   See https://www.beenverified.com/pricing/
10  See https://stellarfi.com/learn/how-to-get-a-spokeo-free-trial

and desist all distribution of my stream. This includes removing the post from Kiwi Farms, as well as never again distributing the video to anyone in any capacity, for any reason.

<u>V-3-B: Submit all his electronic devices for impounding & disposition</u>

95.     Second, pursuant to my request in Dkt. 1, ¶ 25, I ask that the Defendant ordered to submit all of his electronic devices (including computers, smartphones, and any other devices where the video in question might reasonably be stored) for impounding, pursuant to 17 USC § 503(b), and have them wiped clean of any instances of infringement. I ask that the Defendant be made to bear the costs in the first instance of this impounding and disposition, not simply to reimburse my expenses.

<u>V-3-C: Ensure all third-party distributions of the stream are ceased, unless they did not result from his infringement.</u>

96.     Third, pursuant to my request in Dkt. 1, ¶ 26, I ask that the Defendant be ordered to, personally and by any means necessary, ensure that all instances of infringement that occurred as a direct or indirect result of his posting the video on KiwiFarms (such as the incident mentioned in Section IV-3-E of this Motion) be undone.

97.     This includes ...

(a)     ensuring that all instances that appear on any other website must be taken down, and

(b)     that, if anyone who saw that Kiwi Farms thread had downloaded a copy of that video to their own devices, that the Defendant be ordered to ensure, by any means necessary, that their devices are likewise impounded and purged of any/all instances of infringement in a manner similar to what I requested in Section V-3-B above.

98.     An exception to this can be made if he can prove that the subsequent infringement was not caused, either directly or indirectly, by his posting of the video to Kiwi Farms. For example, if he could *prove* (not just plausibly allege) that somebody else had (A) paid me the $1 fee to see the stream, (B) downloaded it just like Jones did, and (C) then proceeded to repost the video entirely independent of Jones' actions, then he would not be in violation of this injunction.

99.     However, that would require that Jarrod Jones bear the burden of proof. If someone reposts the stream after downloading it from some anonymous torrent app, and Jones cannot

prove that the origins of that video file came from an original source other than him, it should be presumed that his posting of the video to Kiwi Farms that fateful day was an ancestor action that enabled the other party to obtain the video without paying me.

100.    Why should he hold the burden of proof? Because it is clear that he is the one who set the act into motion in the first instance. But for Jarrod Jones acting in blatant and flagrant violation of my legal rights, none of this would ever have happened in the first place. Therefore, he should be made to suffer the consequences of the domino effect he deliberately and maliciously caused.

101.    Does that sound like it would be impossible to ever achieve, especially the part mentioned in ¶ 99(b)? Well, even if that is true[11], maybe the Defendant should have thought about that when he was reposting my video with the express intention of inflicting an injury onto me that can never be fully undone. After all, it would be the epitome of a pyrrhic victory if the defendant was enjoined to stop circulating my copyrighted content, but not ordered to clean up the mess he had already made. That would be the equivalent of ordering an arsonist to stop burning down the plaintiff's house after the house had already been reduced to ashes, but not ordering the arsonist to repair the damage he had already inflicted.

102.    It may indeed be true that the defendant will never, in his entire lifetime, be able to fully comply with the portion of this injunction described in ¶ 99(b) (again, I am not admitting to that; I am just playing devil's advocate). But at that point, he should lose that defense because his "inability to comply with the district court's ... order is the intended result of [his] own conduct." See  FTC v. Affordable Media, LLC, 179 F. 3d 1228, 1239 (9th Cir. 1999).

103.    Another way of looking at this is to compare Jones' position to that of a contributory

---

11 For the record, I am not admitting that it is impossible. "It is well established that a party petitioning for an adjudication that another party is in civil contempt does not have the burden of showing that the other party has the capacity to comply with the court's order. Instead, the party asserting the impossibility def-ense must show categorically and in detail why he is unable to comply." See FTC v. Affordable Media, LLC, 179 F. 3d 1228, 1240-41 (9th Cir. 1999) (citations and quotations omitted).

Rather, I am saying that, *even if* it is impossible, that should not absolve the defendant of liability in this case. If he can never comply with this injunction because it is impossible, maybe he should have thought about that when he was willfully and maliciously setting out to cause this injury with the *express intent of making it impossible to fix*. At that point, the impossibility should be his problem, not mine. See FTC, supra at 1239 ("It is readily apparent that the [defendant's] inability to comply with the district court's ... order is the intended result of their own conduct").

infringer. To be liable for contributory infringement,

104.    So if he cannot comply with this injunction, removing all unauthorized instances of my livestream from the Internet in totality, then he can simply spend the rest of his life in contempt of court, forever paying the additional damages I about to request in Section V-4 below, on a recurring basis, for the rest of his life.

105.    But even barring all of that, there is no need for the Court to make such a determination at this stage. If the Defendant truly is legally entitled to the "impossibility" defense, he can simpy have the contempt of court charge dismissed that way (though even that would require he appear in the case and get the default judgment vacated). For this reason, the Court has nothing to lose for going ahead and issuing the injunction at this stage. We can cross the "impossibility" bridge when we come to it.

106.    Therefore, the defendant should be enjoined to remove any and all unauthorized instances of my livestream from the Internet, by any means necessary, even if it takes him the rest of his life. It is drastic, but it is an appropriate response considering the scope of the defendant's malice.

**V-4: Contempt of Court fines of $100 every day the injunctions are not complied with, and coercive confinement if the contempt damages are not paid in a timely manner**

107.    To encourage the Defendant to put forth every possible effort to comply with the injunctions requested above, I ask the Court to award Trobaugh damages and fines of $100 per day, for every day that the Defendant does not submit proof that he has complied with each of the injunctions. Just like in the aforementioned example when Donald Trump was fined $10,000 per day for contempt of court, so too should Jarrod Jones be subject to daily fines for every day he does not comply.

108.    If he ignores all three injunctions, I should receive Trobaugh damages of $300 per day. If he complies with the first two injunctions but cannot, despite his best efforts, comply with the massive requirements of the third injunction, then he should pay me civil fines of $36,500 per year in perpetuity until he submits proof that 100% of his dirty work has been cleansed from the entire worldwide Internet.

109.    The fines should be payable to me, not into the Court, because this would be a civil

contempt of court, and so would be "remedial, and for the benefit of the complainant... many civil contempt proceedings have resulted ... in the imposition of a fine, payable to the complainant." See Gompers v. Bucks Stove & Range Co., 221 US 418, 441 (1911).

110.    Unlike the statutory damages, these fines should not be capped at $150,000. The reason for this is because these are not statutory damages for copyright infringement, but civil fines for contempt of court, which has no upper limit beyond what is unconstitutional. Statutory damages compensate me for the infringement which has already occurred before the judgment; civil contempt charges (which are remedial not punitive) compensate me for the *continued* harm that his *continued* actions cause *after* the judgment. Therefore, it should not be subject to the $150,000 cap found in 17 USC § 504(c)(2).

111.    And no, the impossibility of complying with the third injunction should not be an excuse, for reasons I already explained in that section.

112.    Nor would recurring perpetual damages of $36,500 per year bankrupt[12] him, because as I showed above, he makes six figure income just from investments alone. Of course, even if it would be financially devastating to him, that still isn't an excuse to not award either civil fines or punitive damages that are otherwise justified on the merits. See White v. McKinley, 605 F. 3d 525 (8th Cir. 2010), rejecting the Defendant's argument "that the [otherwise justifiable] punitive damages award of $1 million is excessive and violates his due process rights [simply because] his net worth of only $31,000,"  and further holding that, regarding punitive damages (and presumably civil fines for contempt too), "the most important factors to consider in a due process analysis include the degree of reprehensibility of the defendant's conduct and the ratio of punitive damages to the actual harm inflicted on the plaintiff." but not the defendant's financial solvency. See id at 538 (citations and quotations omitted).

113.    Here, the reprehensibility of the Defendant's conduct is among the highest it could possibly be (as I demonstrated in Sections IV-3-A and IV-3-D above), and because I am only asking for these fines for as long as the injunctions are not complied with, they are directly proportional to the harm being inflicted, as established by the Trobaugh precedent. Therefore, my request for these fines is not arbitrary or excessive.

---

12  Not that he would even be eligible to discharge the debt in bankruptcy anyway; see ¶ 90 above.

114.    If he fails to comply with the injunctions and fails to pay the daily fines for his failure to comply, then he should be sentenced to coercive confinement.

### V-5: Any Other Relief

115.    Last but not least, I ask the Court to consider awarding me any other relief that it feels would be conducive to making me whole. I requested this in Dkt. 1, ¶ 27, so the Court can still award it to me, notwithstanding the provisions of Fed.R.Civ.P. 54(c).

### VI: CONCLUSION

116.    The Defendant has spent nearly two years infringing on my copyright in the most brazen manner imaginable. When given the chance to tell his side of the story, he opted to instead default because there was no defense he could possibly raise. It's time for him to suffer the consequences of his actions.

117.    Wherefore, premises considered, I respectfully pray that default judgment be entered against the Defendant in a manner described above, and for any other relief to which I may be entitled.

So requested on this, the 27th day of March, 2024.

*/s/ David Stebbins*
David Stebbins (pro se)